

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00404-CV

_____

IN THE INTEREST OF J.D., J.D., E.R., M.R., AND G.R., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-731916-23

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant L.R. (Mother) appeals the termination of her parental rights to three of her children—E.R. (Eric),[2] M.R. (Matthew), and G.R. a/k/a G.B. (Gwen)—following a two-day bench trial.[3] Mother also appeals the findings in the order stating that Mother should not be appointed as possessory conservator of two of her children—J.D. (Jennifer) and J.D. (Jane)—for whom the Department did not terminate Mother's parental rights.[4] The trial court found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed Eric, Matthew, and Gwen to remain in conditions or surroundings that had endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed Eric, Matthew, and Gwen with persons who had engaged in conduct that had endangered their physical or emotional well-being; and (3) failed to comply

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

[3]The trial began on July 15, 2024. It resumed on August 22, 2024, and concluded on that date. Whenever necessary to show the timing of the most recent testimony, we describe it as being given during the "August trial."

[4]Although the Department removed Jennifer and Jane with the other three children, it announced at trial that it was not seeking termination of Mother's parental rights to Jennifer and Jane.

with her court-ordered service plan.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).  The trial court also found that termination of the parent–child relationship between Mother and Eric, Matthew, and Gwen was in their best interest.[5]  *See id.* § 161.001(b)(2).  The trial court further found that appointing Mother as Jennifer's and Jane's possessory conservator would not be in their best interest and that unsupervised possession or access by Mother would endanger their physical or emotional welfare.

In four issues, Mother challenges whether sufficient evidence supports the endangerment and best-interest findings and whether the trial court abused its discretion by not appointing her as possessory conservator of Jennifer and Jane.  Because sufficient evidence supports the endangering-conduct finding, the best-interest finding, and the conservatorship finding, we affirm.

## II.  Background

### A.  Overview

Mother has nine children.  In addition to the five children listed above, Mother had a son I.R. (Izzy),[6] a daughter L.D. (Lizzy), and a daughter T.D. (Tiffany) who were

---

[5]The termination order also terminated the parental rights of J.D., who is described in the order as the alleged father of Jane, Eric, and Matthew; the acknowledged father of Jennifer; and the adjudicated father of Gwen.  For ease of reference, we refer to J.D. as Father.  He did not appeal.

[6]While the case was pending, Izzy was removed from Mother because she was unable to meet his needs.  The Department became Izzy's permanent managing conservator when he was seventeen years old; he was eighteen at the time of the trial, so he was no longer in extended care and was living with Mother.

3

not part of this case. A few months before this case went to trial, Mother gave birth to another daughter, D.J. (Destiny). The record demonstrates that Mother had a lengthy history with the Department that included domestic violence, as well as medical neglect and neglectful supervision of her children.

**B.     CPS History**

At trial, Mother agreed that her first investigation by Child Protective Investigations (CPI) was opened in June 2008 because she had left the hospital against medical advice after taking Izzy there with a spiral fracture to his left arm. Mother also agreed that Father had caused Izzy's fracture. Mother received a reason-to-believe disposition for medical neglect.

Mother acknowledged that her first Family-Based Safety Services (FBSS)[7] case was from August 2008 to mid-February 2009 and that she had completed various services and had agreed not to allow Father to have unsupervised contact with Izzy or other children until Father had completed his services.

Five months after the FBSS case closed, Mother came under investigation because of domestic violence by Father. Mother agreed (1) that during that investigation, she was provided an apartment by Open Arms because she was a domestic-violence survivor and (2) that she, along with her three children at that time,

---

[7]One of the Department's employees explained that FBSS is "basically a stage of service that is open towards the end of an investigation where CPI refers the family for them to receive ongoing services once the investigation closes out."

4

had left that apartment and had returned to Father. Mother admitted that her children were removed in July 2009, that she had completed all of her services, and that her children were returned to her in 2011.

Mother said that things went well from 2011 to 2014 because she had stable housing, was working, and was going to school and because the children were going to school.

Mother came under investigation again in 2014 because a man named Demetrius Brown had grabbed her around the neck. Mother also admitted that she had reengaged with Father and that he had hit her in the eye while some of the children were present.

Mother agreed that she had worked all the services on her second FBSS case between December 2016 and May 2017.

Mother did not recall receiving a reason-to-believe disposition for medical neglect in November 2018 to January 2019 for refusing to seek adequate medical attention for a seven year old who was exhibiting extreme behavioral issues that were a danger to the child and to other people. Nor did she remember receiving a reason-to-believe disposition in January of 2019 for neglectful supervision of Jennifer and Lizzy. But Rochelle Hill, who was employed in a division of CPI, testified that the Department had gotten involved with the family in 2018 because there were concerns of severe behavioral issues with Jennifer and Jane and because Mother was not following through with recommendations for mental-health help for the children.

5

When Hill spoke with Mother on December 11, 2018, Mother said that she had allowed Father to stay with her for a short period of time because he was having financial issues. Hill testified that it was concerning that Mother had let Father back into their home after his numerous convictions, including ones in which Mother was the victim.[8] When Father returned, he tried to whip the children; Mother tried to stop him; and Father headbutted her, pushed her over some furniture, and broke a mirror. After that incident, the case proceeded to an investigation because the Department received two referrals—one for medical neglect and one for physical abuse. Hill spoke with Mother on December 17, 2018; created a safety plan; and gave Mother resources for seeking help and for locating domestic-violence shelters.

Mother agreed that she had a third FBSS case between January 2019 and August 2019 and that when the case closed, she and the children were living with Maternal Grandmother.

Mother said it sounded familiar that she had received a reason-to-believe disposition in April 2021 to sometime in July 2021 because the children were getting out of the home and were being left unattended. She further agreed that situation had

---

[8]The Department admitted judgments showing that Father had been convicted of felony assault of a family or household member that occurred in 2009 and in 2019 (Mother was the victim in 2009), possession of cocaine that occurred in March 2016, burglary of a habitation that occurred in 2011, misdemeanor assault causing bodily injury to a family member that occurred in 2008 (Mother was the victim), and delivery of cocaine that occurred twice in 2016.

6

led to her fourth FBSS case between July 2021 and September 2021, but she did not recall being noncompliant with FBSS during that case.

Mother denied having a fifth FBSS case between September and October 2022. But Mother recalled receiving a reason-to-believe disposition in January 2023 because Jennifer (who was twelve at the time) had been missing her doctor appointments since August 2022.

Mother agreed that her sixth FBSS case had started in January 2023 and was ongoing when the children were removed during this case.

### C. The Incident at Cook Children's Medical Center and What the Investigation Revealed about Mother's Living Situation, Her Mental-Health Issues and Drug Use, and the Children's Issues

Passion'e Henry, an investigator with CPI, testified that she was assigned to the case in mid-February 2023 while Mother was involved in her sixth FBSS case. The Department received a report concerning Jennifer's attempt to jump off the ledge of the top floor of the parking garage at Cook Children's. The report detailed that five security officers had to subdue Jennifer and that she was given a shot to calm her down; she was subsequently admitted to Cook Children's Behavioral Health Unit. The report also noted that there was physical neglect of all the children as they were living with Mother in a vehicle that was parked in the parking garage at Cook Children's. Father was incarcerated at that time, as well as most of the time the case was pending.

Henry spoke with Mother at the Department's office in February 2023, and Mother explained her living situation. Mother said that she and her children had been

evicted from an apartment not due to an inability to pay but due to the children's behavior—arguing with neighbors, taking clothes out of the washer and dryer, and leaving trash around the apartment complex. Mother and the children had lived with Maternal Grandparents for a short period of time until Maternal Grandparents had moved. Since then, Mother and the children had alternated between living in Mother's vehicle and staying in motel rooms. Henry said that the family had stayed in motel rooms only when Mother was able to afford it. At the time of the Cook Children's incident, Mother and her eight children were living in her vehicle in the parking garage at Cook Children's because Jennifer had an upcoming appointment due to her diagnoses of schizophrenia, bipolar disorder, sickle cell disease, and lupus.

Mother discussed with Henry what had prompted Jennifer's attempted jump. Mother said that Jennifer had been complaining and whining about needing to go to the bathroom. Instead of waiting, Jennifer got out of the vehicle and went down to the second floor to use the bathroom. When Jennifer did not return, Mother drove around looking for her. When Mother could not find her, Mother alerted the security staff. When they found Jennifer, she said that she did not want to go back with Mother. Mother asked the security staff what she should do if Jennifer did not want to live with her, and they suggested that Jennifer needed to be checked out at the hospital.

Henry said that the seven children (other than Jennifer who was hospitalized) had come with Mother to Henry's office and were very loud; plus, the younger children went into other people's offices and looked in drawers. Henry noted that "at no point

did [Mother] stop and redirect the children or tell them . . . [to] quiet down." Henry had to redirect the children and had to tell them to lower their voices because Mother seemed "checked out" or withdrawn and was not very present.

Mother said that she was taking prescribed hydrocodone. Mother told Henry that she had been diagnosed with anxiety in 2016 and had taken Zoloft for a bit but had stopped because she did not like the way that it made her feel.

Mother mentioned that her son Izzy was on juvenile probation. Mother explained that she had allowed Izzy to discipline the children and that he had taken it too far by punching Jane in the face. As a result, he was charged with family violence.

When Henry spoke with Mother on March 1, 2023, Mother said that she and the children were living with a relative but that she was uncomfortable with the situation. Mother explained that the children had been breaking items and getting into arguments with a neighbor and that she preferred to be in her own space. Two weeks later, Mother informed Henry that she and her children had moved out of the relative's home.

Henry testified that Mother was supposed to go to MHMR for her mental health, but Mother said that she was not able to make her appointments because she did not have anyone to watch the children. Henry expressed that this was concerning because Mother had not been able to follow up on her mental-health needs. Henry noted that FBSS had gotten involved in Mother's life because of medical neglect due to not taking Jennifer to her appointments and that Mother had a history of missing appointments for herself and her children.

When Henry met with Mother and her FBSS caseworker on March 23, 2023, Mother said that she had enrolled the four youngest children in school and that she would soon enroll the older children.[9] They discussed whether Mother would be willing to give the Department voluntary custody of Eric, Matthew, and Jane and to allow Gwen to go live with her alleged father. Mother said that she was overwhelmed, that she was tired of taking the children from motel to motel because it was "no way for a child to live," that she wanted them to be happy, and that she wanted the Department to take over temporarily. Henry asked Mother about allowing Jennifer to be placed in the Department's care because her medical needs and mental health were not being addressed, but Mother responded that she wanted to keep Jennifer in her care specifically because of her medical and mental-health needs. When Henry said that if the Department removed the children that day, they would like to include Jennifer in the removal, Mother wadded up the statement she had written to temporarily allow the Department to care for three of her children and stepped outside. The Department did not remove the children that day.

Later that day (March 23, 2023), Henry spoke to Mother about her hydrocodone use. Mother said that she was taking the medication due to lingering pain from a bone

_____

[9]Prior to the removal, the children were not enrolled in school. Although the older children had been enrolled in school at some point in their lives, they had missed years (e.g., Jennifer had completed second or third grade but was enrolled in eighth grade at the time of the August trial), and the youngest children had never been to school. Mother said that when the older children had been enrolled in school, she always had to go pick them up due to behavioral problems.

10

that she had broken in a car crash in 2011. Although Mother had said in February that she had a hydrocodone prescription, she admitted in March that she did not. Mother said that she had obtained the medication from Maternal Grandfather and from a friend. Henry expressed her concerns over Mother's use of non-prescribed hydrocodone because it was not being managed by a doctor and could result in an overdose. Henry said that hydrocodone impairs a parent's ability to pay attention to her children and that Mother's younger children were very active.

Mother also admitted to Henry that she smoked marijuana to manage her anxiety. She claimed that she did not smoke it that often and did so at night after the children had gone to sleep. Henry explained that marijuana could also impair Mother's ability to monitor her children. Although Henry requested that Mother submit to an oral-swab drug test that day, she did not comply.

### D.    The Incident at the Motel and Mother's Drug Addiction

Henry scheduled an appointment to meet with Mother the next day—March 24, 2023—to which Mother agreed but did not show. Henry and Letitia White (another investigator with CPI) went to the motel where Mother and the children were staying. After Henry arrived, she saw Jane, Eric, and Matthew near an open window in a ground-floor room; Gwen was also in the room. When the children saw her, they closed the window and ran. Henry noted that there was no adult in the motel room to supervise the children.

11

Henry found Mother and the remaining children sleeping in Mother's vehicle, which was parked in front of the children's motel room.[10] Henry went up to the vehicle and knocked on the driver's side window, which had a jacket or a sheet covering it. It took several knocks before Mother, who "was heavily asleep," woke up.

White testified that she had spoken with Mother at the motel. Mother initially denied having taken hydrocodone but then admitted to having taken it multiple times per day even though she did not have a prescription. Mother said that at one point, she had been taking two to three pills at once but was down to one pill per day. Mother also admitted taking Soma—a muscle relaxer—that was not prescribed to her. Mother further admitted that she had taken a lot of pills but was "unsure of what they [we]re." Mother explained that she had taken prescription pills without a prescription because she had pain from a prior leg injury and because they made her "feel free" and made her "feel good." White was concerned about Mother's ability to supervise and protect her younger children when she was taking medication for which she was not under a doctor's order. White said that Mother's eyes were very glassy; that her responses were very delayed; and that she talked "a little bit with her mouth twisted" and kept wiping the corners of her mouth.

---

[10]When asked at trial about the motel incident that prompted the children's removal, Mother explained that Izzy has always been "stubborn and to hisself [sic]" and that she had stayed up all night to make sure that he was okay. Mother said that she had put the babies in bed to sleep and claimed that Tiffany and Jane were in the room with the younger children.

12

Mother complied with White's request for an oral-swab drug test. When White confronted Mother with the results, Mother said that she had taken hydrocodone two days prior on March 22—the day that she had met with Henry at the Department's office. Mother explained to White that the "Department had stressed her out to the point where she just needed it." White said that this raised concerns that Mother was using hydrocodone to self-medicate her mental-health issues.

At the end of the conversation, Mother admitted that she had taken hydrocodone at 10 p.m. on March 23—the night that she had slept in the vehicle while her young children had slept in the motel. When White confronted Mother about taking hydrocodone while three of her younger children were unsupervised in a motel room, Mother responded that Izzy had to sleep outside in the vehicle "anyway and that she was gonna be out there because of that."

Henry disposed of the case as reason to believe for neglectful supervision and medical neglect. The children—Jennifer, Jane, Eric, Matthew, and Gwen—were removed that day.[11] Henry explained that the other three children (Izzy, Lizzy, and Tiffany) were left with Mother because they were older (ages fourteen to sixteen) and because they could self-protect.

---

[11]During her investigation, Henry spoke with Maternal Grandmother about helping Mother, and Maternal Grandmother said that she and Maternal Grandfather were unable to house the children and were unable to provide financial support.

Henry described how Jennifer had responded to the removal. Jennifer became very upset and aggressive—flipping chairs, throwing a caseworker's laptop, and using some nail glue to stick glitter to a table. Jennifer also took thumbtacks out of the wall and put them in her mouth; a Department employee ultimately convinced Jennifer to spit out the tacks. Henry said that Jennifer was taken to Cook Children's and then was transported to a behavioral hospital.

## E. Services

Mother received a service plan that was made an order of the court on May 24, 2023. In January 2024, while Mother was pregnant with Destiny, Amanda Rountree, a permanency specialist with Our Community Our Kids (OCOK), spoke with Mother about starting the services on her service plan. Rountree testified, and Mother admitted, at trial that Mother had completed only two of her services—utilizing an intimate-partner-violence program (i.e., SafeHaven) and finishing the FOCUS for Mothers program; she did not obtain safe and stable housing; maintain communication with the Department; demonstrate steady employment; submit to random drug testing; and complete a drug-and-alcohol assessment, individual counseling, or a mental-health assessment.

### 1. Housing Instability

While Henry was investigating, she opined that Mother's housing instability was constant and was a result of a lack of financial resources. Henry said that there were only two shelters that were available to Mother due to the number of children that she

had, but Mother did not want to go to them because she felt that she would not be able to properly supervise her children or keep them safe. While the case was pending, Mother gave the Department "random addresses" every other week, showing that she had been living at motels or hotels, with friends or family, in her car, or at SafeHaven.

Mother admitted that housing had been a struggle for her "throughout this last year." She explained that housing was an issue because "with so many kids and [Jennifer's] and [Jane's] behavioral [issues,]" Mother had been kicked out of certain housing programs; Mother said, "So once you get evicted, you can't have housing." Mother noted that her housing was still in flux at the time of the August trial and that she was staying either with Maternal Grandmother or in a motel. Mother claimed that Maternal Grandparents were willing to take any of Mother's children or all of them so that they would not be adopted. Mother stated that she had not been offered access to the Department's housing voucher program even though she had asked for assistance. Mother said that was only available if the plan was reunification.

Bailey Trevino, an investigator with the Department, testified that Mother told her in August 2024 that she was living at SafeHaven due to domestic violence with Destiny's father and that Lizzy and Tiffany were with her. But Trevino noted that closer to the August trial, Mother had been staying in a motel and that she (Trevino) had picked up Mother from Maternal Grandmother's home on the morning of the August trial; Trevino opined that Mother's living situation was "kind of just place to place." At the time of the August trial, Tiffany and Izzy were the only children who

15

were living with Mother. Mother had applied to get into the Salvation Army but had not heard back.

## 2. Mother's Mental Health and Drug Use

Mother mentioned to Trevino that she had anxiety but that she was not receiving any treatment and was not on any medication for it. Mother testified at trial that she believed that she suffered from depression and anxiety, as well as opioid addiction. Mother said that she had last been treated for those issues by a mental-health professional in 2016. She agreed that she had self-medicated with opioids but denied self-medicating with marijuana. When asked what she had done in 2024 to address her depression and anxiety, Mother answered, "Survive."

Mother said that she used opioids for pain and anxiety and that she still experienced pain from the car-crash injuries. Mother said that she had been prescribed hydrocodone in March 2024 following the C-section with Destiny and that she was re-prescribed hydrocodone in June 2024. Mother told Trevino that she would provide a copy of the prescription, but Mother failed to follow through. Mother testified that she did not have a hydrocodone prescription as of the August trial. Mother admitted that she had used marijuana while she was still under OCOK supervision in this case. Rountree said that using opioids and marijuana creates a high-risk situation because it causes Mother to be neglectful in supervising and caring for her children.

Trevino requested that Mother take a drug test ten days before the August trial, but Mother did not take the test, which was presumed positive. Rountree was

encouraged that Mother had taken a drug test on the August trial date, but Rountree had requested that Mother submit to a drug test almost every month while the case was pending and never received compliance.

Mother admitted that she had not addressed her opioid addiction and acknowledged that her addiction had contributed to having her children removed. Mother felt like treatment for her addiction would be helpful but said that she had not been offered treatment. When asked why she did not complete the drug assessment, she said, "When this all happened, so much was throw[n] at me on one big page, and it was just a lot going on."

### 3. Employment

Mother said that she was not receiving any Social Security disability payments, that she had received $200 per month at times for child support for Izzy, and that the longest period of time that she had worked was three years as a wine server. Mother testified that during this case she had worked at Globe Life Stadium for only one month. Mother said that she was a certified nurse's aide but that she was not working as of the August trial.

### 4. Visits

Rountree noted that Mother made nearly all of her visits with the children, demonstrating that she loves her children. But Rountree described the visits as "very chaotic, very disruptive" and said that there had been "a lot of safety concerns with the visits" and that Mother did not redirect the children when they acted out. Due to

17

Mother's struggle to manage her children and their unsafe behaviors, OCOK had to call the police to come to at least one of the visits.[12]

Mother described her visits with the children and said that they all try to talk at once because "it's such a short time." Mother explained that the children are "a little excited and get loud," and "so that's probably where [Rountree] gets the disturbance." Mother said that the children cry when the visits end and that they want to come home.

### F. The Children's Status and Their Needs

Rountree summarized how the children were doing as of the August trial:

- Gwen was living in a general residential operation in Stephenville and was doing "really well." She was "really taken care of by her caregivers" and had "really bonded with them." Gwen was thriving in school and in her extracurricular activities.

- Matthew was living in the same general residential operation as Gwen. Though Matthew was doing well overall and had bonded to his current caregivers, he struggled "slightly with behaviors and in school."

- Eric had been in three placements and was living in a residential treatment center in Houston instead of a foster home because he had started exhibiting extreme anxiety behaviors[13] and because of a serious incident at a prior foster home. He was doing relatively well in his placement and had just started school at the time of the August trial.

---

[12]Rountree explained that the police had been called after Jennifer had refused to leave a visit, had cursed out everyone, had been unsafe and extremely disruptive, and had run down the street.

[13]Mother testified that since the removal, Eric had been prescribed psychotropic medication.

- Jane had been in three to six placements (including psych hospitals), was living in a residential treatment center in Cypress, and was "relatively . . . well taken care of." She struggled with school and "just behavioral issues with social skills and things of that nature, coping skills."

- Jennifer was living in a residential treatment center in Houston (not the same one as Eric) and was doing "relatively well in the placement itself [as far as] connecting with them and them isolating the correct treatment for the services she needs"[14] but was struggling with school. Jennifer had lived in over two dozen placements but was finally in a secure place and was medically stable with her lupus and high blood pressure.

At the time of the August trial, none of the children were in an adoption-motivated home. But the Department had submitted paperwork for the three youngest children to be moved to an adoption-motivated home, and the hope was that they could be placed together. The Department had reached out to the people that Mother had offered as potential placement options but had not found a viable placement option.

### G. Destiny[15]

Trevino investigated Mother and her three-month-old daughter Destiny in August 2024 after receiving a referral stating that Destiny had been missing medical appointments. Destiny was ultimately placed in foster care on August 7, 2024, due to safety concerns and the inability to get in touch with Mother. Two days after Destiny's removal, Trevino was finally able to speak to Mother, who said that she had not seen

---

[14]Mother testified that Jennifer was taking psychotropic medication.

[15]Rountree was not aware of Mother's or Destiny's testing positive for any controlled substances when Destiny was born.

Destiny in two months because Destiny's father (who was a different man than Father) had taken her.

## H. Recommendations

Rountree concluded that Mother had not demonstrated that she could meet the children's physical and emotional needs now and in the future because Mother had not "even addressed her own mental health and emotions." Rountree opined that Mother had not demonstrated that she could protect the children from emotional and physical danger now and in the future because in addition to failing to address her own mental-health issues, she had not completed drug tests, had continued to place herself in dangerous environments, and had continually faced housing and employment losses.

Rountree opined that it was in Eric's, Matthew's, and Gwen's best interest for Mother's parental rights to be terminated. Rountree explained that those three were the youngest and most vulnerable and that termination would give them "a chance at some normalcy and stability and safety." Rountree's termination recommendation was based on Mother's failure to address any of the concerns that had brought the children into the Department's care, including using drugs, failing to meet their needs, failing to manage her own mental health, placing herself in dangerous environments, and failing to obtain stable housing and employment.

When Rountree was asked if it was in Jennifer's and Jane's best interest to have Mother appointed as managing or possessory conservator, Rountree answered yes but then gave the same list of reasons that she had given for terminating Mother's parental

20

rights to Eric, Matthew, and Gwen. When asked if it would be in all of the children's best interest to have the trial court appoint the Department as permanent managing conservator, Rountree answered in the affirmative. On cross-examination, Rountree agreed that all five children desired to return to Mother and said that she (Rountree) was asking the trial court to appoint Mother as Jennifer's and Jane's possessory conservator. On redirect, Rountree stated that she must have misheard the question about conservatorship and that it was the Department's belief that it was *not* in Jennifer's and Jane's best interest for Mother to be appointed as their managing or possessory conservator.

Mother did not believe that it was in the children's best interest for her parental rights to be terminated because she was all they had ever had. Mother opined that it would make the situation "way worse[] for them if they got that type of news." When asked what she wanted the trial court to do, Mother said, "Just help me get the tools to stand on my two feet to take care of them, at least like a boost. And . . . I'll do the best job to finish raising them that I've done so far." Mother agreed that all she was missing was the financial resources to care for her children. But when asked if the Department, other service providers (i.e., SafeHaven and Open Arms), and Maternal Grandmother had given Mother the tools in the past to get a boost, Mother answered, "Yes, they have."

## I.    The Ad Litem's Report

After the defense rested, the children's attorney ad litem gave an oral report to the trial court.  She stated that if the children were returned to Mother, she did not expect to see a different outcome because "if it hasn't happened in 17 years, I don't think it's going to."  The ad litem further explained, "I don't know what it takes to get [Mother] there.  I feel like the [Department] has done everything they can.  It's basically just up to [Mother]."  The ad litem lamented that Jennifer's and Jane's situations were not ideal but said that the younger children were doing well, though Eric was having some problems that she believed would resolve.  The ad litem recommended terminating Mother's parental rights to "all of them" except for the teenagers because "it'd be the same situation whether they're terminated or not," intimating that she did not believe that they would be adopted in the short time before they turned eighteen.

## J.    Disposition

After hearing the testimony, the trial court granted the Department's requested relief.

### III.  Sufficient Evidence Supports the Endangerment and Best-Interest Findings

In her first, second, and third issues, Mother challenges the sufficiency of the evidence to support the endangering-environment, endangering-conduct, and best-interest findings.  We set forth the burden of proof and the standards of review and

then address each of these issues in turn, ultimately holding that sufficient evidence supports all three findings.

## A.    Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is

the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother's conduct had endangered Eric, Matthew, and Gwen[16] and had created an endangering environment for them and that the termination of the parent–child relationship would be in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

---

[16]Subsection (M) allows a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on an endangerment finding under (D) or (E) (or an out-of-state-equivalent). Tex. Fam. Code Ann. § 161.001(b)(1)(M); *see id.* § 161.001(b)(1)(D), (E). So when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.* and holding same).

**B.     Endangerment Findings**

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the jury's endangerment findings under Subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).  Applying the standards of review set forth above, we hold that both legally and factually sufficient evidence supports the Subsection (D) and (E) endangerment findings.

**1.     Applicable Law**

This court has previously set forth the law on endangerment findings and demonstrated how a parent's conduct may be considered within an endangering-environment analysis under Subsection (D):

> Subsections (D) and (E) both require a finding of endangerment. "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct.  [*Boyd*], 727 S.W.2d at 533.
>
> Endangerment under Subsection (D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child."  *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under [S]ection 161.001(b)(1)(D)."). . . .

25

Subsection (D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

A parent's choice to continue a romantic relationship with a partner who exposes the child to domestic violence can constitute endangerment under Subsection (D) because such exposure may cause traumatic harm to a child. *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.) (concluding that parent's choice to continue romantic relationships that exposed child to domestic violence resulting in traumatic emotional harm to child supported environmental endangerment predicate) . . . .

*In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *3–4 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Nor is it necessary to establish that the parent's conduct caused actual harm; rather, it is

26

sufficient if the parent's conduct endangers the child's well-being. *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024).

As we have noted in a prior opinion,

> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

We catalog some of the types of conduct that can be considered in an endangering-conduct analysis:

- Because a parent's illegal drug use exposes her child to the possibility the parent may be impaired or imprisoned, evidence of illegal drug use supports a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *See J.O.A.*, 283 S.W.3d at 345.

- "A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds." *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

- Also as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

Moreover, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346.

## 2. Analysis

The record demonstrates that Mother had a continuing course of conduct that endangered her children and that her conduct created an endangering environment for her children:

- The Department initially became involved with Mother and her children in 2008, and that pattern continued up until the removal of these five children in March 2023. The record is replete with reason-to-believe dispositions in the numerous FBSS cases that investigated Mother for endangering her children through medical neglect and neglectful supervision.

- The record also demonstrates that Mother had a history of using marijuana and of taking hydrocodone and other unknown pills without a prescription. Mother admitted having taken hydrocodone since 2011, having taken up to three hydrocodone pills at once for a period of time, and having taken one hydrocodone pill at 10 p.m. before spending the night in her vehicle with some of her children while leaving four other children unsupervised overnight in a motel room. Despite submitting to a drug test on the day of the August trial and relying on the fact that neither she nor Destiny had tested positive at Destiny's birth in March 2024, Mother admitted at the August trial that she was addicted to hydrocodone. Moreover, the trial court was free to conclude that because Mother had failed to submit to drug tests that had been requested almost every month during the fifteen months that the case was pending, those tests would have been positive. The Department showed how Mother's hydrocodone use endangered her children by impairing her ability to properly supervise them.

- Mother had a history of being unable to properly supervise and care for her children. Mother failed to keep tabs on Jennifer at the Cook

Children's parking garage and left four children completely unsupervised overnight in a motel room. Mother also could not rein in her children's behavior, resulting in chaotic visits, evictions, and destruction at the Department's offices. And Mother delegated her parental duties to Izzy, allowing him to discipline the children to the point that he received a charge of family violence for punching Jane in the face. Additionally, Mother had not taken Jennifer to her mental-health appointments regularly since August 2022, and the record demonstrates how much Jennifer desperately needed such care. And as to the basic necessity of housing, Mother provided no stability for the children as they had no permanent place to live.

- The FBSS cases that preceded the removal in this case reflect that domestic violence was prevalent in the children's lives as a result of the partners whom Mother had chosen. After one child suffered a spiral fracture at Father's hands, Mother returned to Father and brought her children to live with him—the same man who ultimately went to prison for abusing Mother.

- Although Mother had completed FBSS services in many of her prior cases, she admitted that she had completed only two of the services on her current plan and had not addressed the concerns that had caused the children to be removed.

Mother contends that the endangerment findings were based on evidence that she is economically disadvantaged as described in Section 161.001(c)[17] or that related to events that had occurred years earlier. The Department concedes that it "did offer evidence of Mother's economic disadvantage, namely, her lack of stable housing or steady employment[] but [that] this was not the only evidence offered for the trial court

_____

[17]Texas Family Code Section 161.001(c)(2) states that "[e]vidence of one or more of the following does not constitute clear and convincing evidence sufficient for a court to make a finding under Subsection (b) and order termination of the parent–child relationship: . . . the parent is economically disadvantaged." Tex. Fam. Code Ann. § 161.001(c)(2).

to base its reasonable conclusion that termination was warranted." We agree with the Department. Of the items that we have cataloged, Mother's exposing the children to her abusive partners, her use of hydrocodone and other medications without a prescription, and her inability to redirect and supervise her children do not directly correlate to any sort of economic disadvantage. Moreover, despite Mother's protest against the use of prior history, she cites nothing to support her argument, and the Department was permitted to put on evidence of events that had occurred years earlier to meet Subsection (E)'s requirement of showing that there was a "voluntary, deliberate, and conscious course of conduct." *See R.H.*, 2021 WL 2006038, at *13.

Applying the standards of review set forth above, we hold that the evidence is legally and factually sufficient to support the endangerment findings under Subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re A.M.*, No. 02-24-00199-CV, 2024 WL 4157766, at *14 (Tex. App.—Fort Worth Sept. 12, 2024, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support the endangering-conduct finding when the jury had heard about multiple types of endangering conduct, including drug use, prior CPS history, and domestic violence); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *10, *12–13 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support endangerment findings because there was "no doubt that Mother's failure to act—specifically, failure to adequately supervise—endangered her [c]hildren"); *In re J.A.V.*, 632 S.W.3d 121, 131–34 (Tex. App.—El Paso 2021, no pet.)

(holding evidence legally and factually sufficient to support endangering-conduct finding when, among other things, mother used hydrocodone while caring for child because it affected mother's ability to parent). We overrule Mother's first and second issues.

## C. Best-Interest Finding

In her third issue, Mother challenges the sufficiency of the evidence to support the best-interest finding.[18] After applying the best-interest factors, as set forth below, we conclude that the finding is supported by legally and factually sufficient evidence.

### 1. The Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light

---

[18]In the list of issues in Mother's brief, she characterizes her best-interest argument as challenging both the legal and factual sufficiency. When she repeated that argument later in her brief, she mentioned only factual sufficiency. For purposes of completeness, we will analyze both the legal and factual sufficiency of the evidence to support the best-interest finding.

of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A)     the [child's] desires . . . ;
>
> (B)     the [child's] emotional and physical needs[,] . . . now and in the future;
>
> (C)     the emotional and physical danger to the child now and in the future;
>
> (D)     the parental abilities of the individuals seeking custody;
>
> (E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;
>
> (F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;
>
> (G)     the stability of the home or proposed placement;
>
> (H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and
>
> (I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best

interest.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

### 2. Analysis

#### a. The Children's Desires

It was undisputed at trial that the children love Mother and want to live with her. The trial court was entitled to find that this factor weighed against termination of Mother's parental rights to Eric, Matthew, and Gwen.  *See In re C.S.*, No. 02-14-00386-CV, 2015 WL 1869443, at *13 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op.) (citing *W.D. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00581-CV, 2015 WL 513267, at *6 (Tex. App.—Austin Feb. 5, 2015, no pet.) (mem. op.), for the proposition that children's desires to live with parent arguably weigh in favor of allowing parent to retain her parental rights but ultimately holding that other factors were sufficient to support jury's best-interest finding).

#### b. The Children's Emotional and Physical Needs and the Danger to the Children

The children's physical needs included basic necessities like safe, stable housing. Mother had been unable to provide any housing stability for the children and often resorted to having all eight children spend the night with her in her vehicle. Additionally, as described in the endangerment analysis, Mother had exposed the children to domestic violence and was unable to properly supervise the children due in part to her opioid addiction, which posed an ongoing threat to the children since

33

Mother had not addressed her addiction while the termination suit was pending. The children's emotional needs were diverse as they all exhibited disruptive behaviors that had gotten them sent home from school and evicted from apartments, and Eric had extreme anxiety and was taking psychotropic medication. Mother had not shown an ability to redirect her children or to help them self-regulate and had failed to take Jennifer to her medical appointments for several months—a fact from which the trial court could have concluded that Mother would have difficulty taking Eric to his follow-up appointments to monitor his psychotropic medication if he were returned to her. The trial court was entitled to find that these two factors weighed in favor of termination of Mother's parental rights to Eric, Matthew, and Gwen.

### c.   Parenting Abilities, Acts and Omissions Suggesting an Improper Relationship, and Available Programs

As detailed in the endangerment analysis, Mother's lack of parenting skills, as well as her improper acts and omissions, included being unable to properly supervise her children, especially after giving into her hydrocodone addiction; her decision to leave young children in a motel room overnight without adult supervision; her decision to allow Izzy to discipline the children; and her poor relationship decisions that resulted in the children's witnessing domestic violence and in Izzy's receiving a spiral fracture. Despite having completed FOCUS for Mothers, Mother failed to demonstrate at the visits that she had learned how to manage or redirect her children and instead allowed them to be disruptive. These acts and omissions indicate that the existing parent–child

34

relationship is an improper one. Furthermore, Mother acknowledged during the August trial that the Department, SafeHaven, and Open Arms had given her the tools that she needed to "get a boost," but she had failed to take advantage of the many services that she was offered. The trial court was entitled to find that these three factors weighed in favor of termination of Mother's parental rights to Eric, Matthew, and Gwen.

### d. Plans for the Children and Stability of Proposed Home

At the August trial, Rountree explained that after no viable kinship option was found, she had spent the month prior to the trial attempting to find an adoption-motivated foster home that would take all three children. Rountree had not been successful in locating that type of placement as of the August trial, but it was still the Department's plan for the three children to be adopted together. The stability of the Department's proposed home for the children thus remained in question.

Mother did not testify regarding a specific plan for the children if they were returned to her care but instead requested tools "to stand on [her] two feet to take care of them" and that she would "do the best job to finish raising them that [she had] done so far." Mother believed that Maternal Grandparents would allow the children to live with them, despite that Maternal Grandmother had previously told the Department that she and Maternal Grandfather were unable to take the children and that Mother was not even living there full time but was bouncing between Maternal Grandparents' home and motels.

The trial court was entitled to find that these two factors were neutral.

### e.     Excuses

Mother admitted that her opioid addiction had contributed to having her children removed. But Mother never explained why she did not have full-time employment and blamed her housing instability on her children, stating that "with so many kids and [Jennifer's] and [Jane's] behavioral [issues,]" she had been kicked out of certain housing programs and that "once you get evicted, you can't have housing." Mother also blamed the disruptive, chaotic visits on the short time that they were given and on the children's desire to all talk at once. Because Mother accepted some responsibility but also gave excuses, the trial court was entitled to find that this factor was neutral.

### f.     Sufficient Evidence of Best-Interest Factors

As she did with her challenges to the endangerment findings, Mother contends within her best-interest argument that "[e]vidence that the parent is economically disadvantaged does not constitute clear and convincing evidence." And as we concluded regarding the endangerment findings, the trial court's best-interest finding can be supported by non-economic evidence, including Mother's hydrocodone addiction, domestic-violence exposures, inability to redirect and parent the children, and failure to take advantage of the services that she was offered.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the finding that termination of Mother's parental

rights to Eric, Matthew, and Gwen is in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re A.V.*, No. 11-23-00144-CV, 2023 WL 8631492, at *8 (Tex. App.—Eastland Dec. 14, 2023, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support the best-interest finding based on, among other things, mother's lack of parental abilities, history of domestic violence and drug abuse, her inability to provide a safe and stable environment, and the lack of justification for her misconduct); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the best-interest finding when most of the best-interest factors weighed in favor of termination). We overrule Mother's third issue.

## IV. Sufficient Evidence Supports Conservatorship Finding

In her fourth issue, Mother argues that the trial court abused its discretion by not appointing her as possessory conservator of Jennifer and Jane because the evidence is legally and factually insufficient to overcome the parental presumption of Texas Family Code Section 153.191. Because the best-interest factors are also used in determining conservatorship and because the best-interest factors weigh against appointing Mother as possessory conservator, she has not shown that the trial court abused its discretion by failing to appoint her as possessory conservator.

## A.    Standard of Review and Burden of Proof

The Houston Fourteenth Court of Appeals has set forth a succinct summary of the standard of review and the burden of proof applicable to conservatorship determinations:

> The trial court's conservatorship determinations are subject to review only for abuse of discretion[] and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Unlike termination findings, which must be supported by clear and convincing evidence, findings on conservator appointments must be supported by a preponderance of the evidence. *See id.* ("[A] finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard.").
>
> Under the abuse[-]of[-]discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error[] but rather are relevant factors in assessing whether the trial court abused its discretion. *In re T.J.L.*, 97 S.W.3d 257, 266 (Tex. App.—Houston [14th Dist.] 2002, no pet.). There is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*
>
> . . . .
>
> In determining conservatorship issues, the primary consideration of the trial court is the best interest of the child. *Ayala v. Ayala*, [387 S.W.3d 721, 730] (Tex. App.—Houston [1st Dist.] . . . 2011, no pet.). The *Holley* factors for determining the best interest of the child are applicable to conservatorship decisions. *See id.* (applying *Holley* factors to trial court's decision on appointment of sole managing conservator).

*In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *11–12 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.).

## B.     Relevant Statutes

Texas's public policy on conservatorship is to

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

Tex. Fam. Code Ann. § 153.001(a).  The Family Code states that "[i]f a managing conservator is appointed, the court *may* appoint one or more possessory conservators." *Id.* § 153.006(a) (emphasis added).  Moreover, as noted in Mother's fourth issue, Family Code Section 153.191 provides a presumption regarding appointing parents as possessory conservators:

> The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

*Id.* § 153.191.

## C.     The Trial Court's Findings

Here, the termination order contains findings that "the appointment of [Mother] as permanent managing conservator of [all five children] is not in [their] best interest because the appointment would significantly impair [their] physical health or emotional development."  The trial court appointed the Department as permanent managing

39

conservator for each of the five children.[19]  The trial court did not appoint a possessory

conservator for any of the five children.

With regard to Jennifer and Jane, the termination order also includes possessory-

conservatorship findings:

> 12.1   The [c]ourt finds and **IT IS ORDERED** that [Mother is] not appointed as possessory conservator of [Jennifer] and shall not have unsupervised possession or access[] because the [c]ourt finds such appointment would not be in the best interest of this child and that unsupervised possession or access by [Mother] would endanger the physical or emotional welfare of this child.
>
> . . . .
>
> 13.1   The [c]ourt finds and **IT IS ORDERED** that [Mother is] not appointed as possessory conservator of [Jane] and shall not have unsupervised possession or access[] because the [c]ourt finds such appointment would not be in the best interest of this child and that unsupervised possession or access by [Mother] would endanger the physical or emotional welfare of this child.

After both possessory-conservatorship findings, the trial court stated that Mother was

allowed to have continued visitation with Jennifer and Jane.

**D.   Analysis**

The crux of Mother's argument is that "[t]here is confusion in the record as to

whether . . . the [D]epartment was asking for Mother to be appointed possessory

---

[19]Mother does not raise an issue challenging the appointment of the Department as permanent managing conservator.

conservator of the children" because Rountree gave contradictory testimony.[20] Although the record confirms that Rountree gave inconsistent testimony, which is set forth in the background section above, she clarified on redirect that she had misheard the prior conservatorship questions and that it was the Department's belief that it was *not* in Jennifer's and Jane's best interest for Mother to be appointed as their managing or possessory conservator. Rountree explained that it was not in Jennifer's and Jane's best interest for Mother to be appointed as their managing or possessory conservator because she had not addressed any of the concerns that had brought her children into care, had not worked her services, had not addressed her mental health, had continued to place herself in dangerous situations, had not maintained housing or employment, and had not demonstrated that she can be safe or protective of her children.

The remainder of Mother's argument is that "the testimony showed that the children were excited for visits and sad when it was time to leave. There was no evidence presented to suggest that Mother's possession or access would endanger the physical or emotional welfare of the children." Mother's argument ignores the overwhelming evidence that was unfavorable to her. As summarized in Rountree's explanation (which is set forth in the preceding paragraph) and as set forth in the detailed Section 161.001(b)(2) best-interest analysis above, the same best-interest

_____

[20]Although Mother does not specifically limit her argument to Jennifer and Jane, Rountree was only unclear in her responses to questions related to the conservatorship of Jennifer and Jane; Rountree made clear that the Department was pursuing termination as to Eric, Matthew, and Gwen.

factors that weighed in favor of terminating Mother's parental rights to Eric, Matthew, and Gwen also weigh in favor of not appointing Mother as possessory conservator of Jennifer and Jane. Moreover, Jennifer struggled with both physical and mental-health issues, and Jane struggled with behavioral issues. Mother, however, had failed to take Jennifer to her medical appointments for several months; had not demonstrated an ability to adequately supervise her children; had delegated her parenting duties to Izzy, who had punched Jane in the face and had received a family-violence charge; had failed to keep Jennifer and Jane enrolled in school; and had failed to provide a safe and stable home for the children.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that appointment of Mother as possessory conservator of Jennifer and Jane, as well as the other three children, is not in their best interest and would endanger their physical or emotional welfare. *See In re A.J.*, No. 12-23-00079-CV, 2023 WL 5428281, at *4 (Tex. App.—Tyler Aug. 23, 2023, no pet.) (mem. op.) (holding that evidence was sufficient to support finding that appointment of mother as possessory conservator was not in child's best interest and would endanger the child's physical or emotional welfare when mother had a history of substance abuse and other concerning behaviors that resulted in her disregarding her parental responsibilities); *A.H.A.*, 2012 WL 1474414, at *13 (concluding that the trial court did not abuse its discretion by failing to appoint mother possessory conservator of the five children to

which her parental rights were not terminated because there was evidence of drug use and prior CPS history). We overrule Mother's fourth issue.

## V. Conclusion

Having overruled Mother's four issues, we affirm the trial court's judgment terminating Mother's parental rights to Eric, Matthew, and Gwen and denying Mother possessory conservatorship of Jennifer and Jane.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: January 9, 2025